**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

|  |  |
|---|---|
| WSOU INVESTMENTS, LLC, d/b/a BRAZOS LICENSING AND DEVELOPMENT,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>TP-LINK TECHNOLOGY CO., LTD.,<br><br>　　　　　Defendant. | Civil Action No. 6:20-cv-1019-ADA<br>Civil Action No. 6:20-cv-1020-ADA<br>Civil Action No. 6:20-cv-1021-ADA<br><br>**JURY TRIAL DEMANDED** |

## <u>TP-LINK CHINA'S OPENING CLAIM CONSTRUCTION BRIEF</u>

Defendant TP-Link Technologies Co., Ltd. ("TP-Link China") respectfully submits this claim construction brief in support of its proposed constructions.[1]

---

[1] As set forth in TP-Link China's motion to dismiss for invalid service of process/lack of personal jurisdiction, or in the alternative, to vacate the Court's alternative service order and to quash for invalid service of process (Dkt. No. 17), in its motion to defer entry of a scheduling order and/or stay (Dkt. No. 20), and at oral hearing, TP-Link China maintains that there is no jurisdiction over it and that this action should not proceed. The Fifth Circuit has repeatedly confirmed that "a non-resident defendant may participate in litigation without submitting to the court's jurisdiction so long as it maintains its objection to personal jurisdiction." *Haliburton Energy Servs., Inc. v. Ironshore Specialty Ins. Co.*, 921 F.3d 522, 540 (5th Cir. 2019). Defendant's filing in this litigation thus is not a waiver of TP-Link China's personal jurisdictional challenge and special appearance to contest jurisdiction.

# TABLE OF CONTENTS

**Page**

I.  U.S. PATENT NO. 7,333,770 (CASE NO. 6:20-CV-01019) CLAIM TERMS ...................................................................................................1

    A.  "broadcast"/"broadcasting" (claims 1–5, 7, 11–14, and 16–18)..........................2

    B.  "as a function of objective or subjective criteria" (claims 1, 2, 11, and 18) ...........................................................................................5

    C.  "filter mechanism" (claims 1, 7, 11, 13, and 16) ....................................7

    D.  "retransmission mechanism" (claims 3, 7, and 15–16)........................11

    E.  "synthesizing mechanism" (claims 2, 7, 10, and 18)...........................13

II.  U.S. PATENT NO. 8,774,790 (CASE NO. 6:20-CV-01020) CLAIM TERMS .................................................................................................14

    A.  "said reconfiguration solution *adapted to* reconfigure the base station element to serve a portion of the plurality of wireless terminals, wherein the reconfiguration solution depends on a type of the failure condition" (claims 1, 14, 19, and 20) ....................................16

III.  U.S. PATENT NO. 9,548,977 (CASE NO. 6:20-CV-01021) CLAIM TERMS .................................................................................................23

    A.  "a vendor specific attribute according to the standard of Wi-Fi Alliance" (claims 1, 5, 10, 11, 13, and 15) .......................................23

    B.  "one processor; and at least one memory including computer program code, the at least one memory and the computer program code configured to, with the at least one processor, cause the apparatus to perform at least the following:" (claims 5, 11, and 13) ......................................................................................25

    C.  "A non-transitory computer-readable storage medium including computer-readable program code, which when executed by at least one processor provides operations comprising:" (claim 10) ......................29

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Advanced Ground Info. Sys., Inc. v. Life360, Inc.*,
  830 F.3d 1341 (Fed. Cir. 2016)......................................................................................17

*Alacritech, Inc. v. Century Link Commc'ns LLC*,
  271 F. Supp. 3d 850 (E.D. Tex. 2017)...........................................................................10

*Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*,
  521 F.3d 1328 (Fed. Cir. 2008)...............................................................................11, 22

*Bushnell Hawthorne, LLC v. Cisco Sys., Inc.*,
  813 F. App'x 522 (Fed. Cir. 2020) .............................................................................5, 24

*Chimie v. PPG Indus., Inc.*,
  402 F.3d 1371 (Fed. Cir. 2005).......................................................................................3

*Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*,
  No. 2:14-cv-0912-JRG-RSP, 2015 WL 6746910 (E.D. Tex. Nov. 4, 2015)...........................9

*Cypress Lake Software, Inc. v. ZTE (USA) Inc.*,
  No. 6:17-cv-00300-RWS, 2018 WL 4035968 (E.D. Tex. Oct. 23, 2018)................................9

*Datamize, LLC v. Plumtree Software, Inc.*,
  417 F.3d 1342 (Fed. Cir. 2005).......................................................................................6

*Digital Retail Apps, Inc. v. H-E-B, LP*,
  No. 6:19-cv-00167-ADA, 2020 WL 376664 (W.D. Tex. Jan. 23, 2020) ..............................22

*Dyfan, LLC v. Target Corp.*,
  No. 6:19-cv-00179-ADA, 2020 WL 8617821 (W.D. Tex. Nov. 25, 2020) ....................17, 27

*Egenera, Inc. v. Cisco Sys., Inc.*,
  972 F.3d 1367 (Fed. Cir. 2020).....................................................................................26

*EON Corp. IP Holdings LLC v. AT&T Mobility LLC*,
  785 F.3d 616 (Fed. Cir. 2015).......................................................................................22

*Fiber, LLC v. Ciena Corp.*,
  792 F. App'x 789 (Fed. Cir. 2019) ................................................................................19

*Function Media, L.L.C. v. Google, Inc.*,
  708 F.3d 1310 (Fed. Cir. 2013)............................................................................... *passim*

## TABLE OF AUTHORITIES (cont'd)

*Halliburton Energy Servs., Inc. v. M-I LLC*,
    514 F.3d 1244 (Fed. Cir. 2008)........................................................................23

*Honeywell Int'l, Inc., v. Int'l Trade Commission*,
    341 F.3d 1332 (Fed. Cir. 2003)..........................................................................5

*Intellectual Ventures I LLC v. T-Mobile USA, Inc.*,
    902 F.3d 1372 (Fed. Cir. 2018)..........................................................................7

*Konami Gaming, Inc. v. High 5 Games, LLC*,
    No. 2:14-cv-01483-RFB, 2018 WL 1020120 (Feb. 22, 2018 D. Nev.).......................... *passim*

*Media Rights Techs., Inc. v. Capital One Financial Corp.*,
    800 F.3d 1366 (Fed. Cir. 2015)........................................................................19

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    572 U.S. 898 (2014).............................................................................5, 7, 25

*Net MoneyIN, Inc. v. VeriSign, Inc.*,
    545 F.3d 1359 (Fed. Cir. 2008)........................................................................11

*Noah Sys., Inc. v. Intuit Inc.*,
    675 F.3d 1302 (Fed. Cir. 2012)....................................................................10, 11

*Optis Wireless Tech., LLC v. Huawei Device Co.*,
    No. 2:17-cv-123-JRG-RSP, 2018 WL 476054 (E.D. Tex. Jan. 18, 2018) ............................9

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)..........................................................................3

*Rain Computing, Inc. v. Samsung Elecs. Am., Inc.*,
    989 F.3d 1002 (Fed. Cir. 2021)....................................................................17, 22

*Rockwell Automation, Inc. v. 3-S Smart Software Solutions, GmbH*,
    No. 2:15-cv-1543-JRG-RSP, 2016 WL 5811485 (E.D. Tex. Oct. 5, 2016) ............................9

*Sarif Biomedical LLC v. Brainlab, Inc.*,
    No. 13–846–LPS, 2015 WL 5072085 (D. Del. Aug. 26, 2015) ............................................17

*Uniloc USA, Inc. v. Samsung Elecs. Am., Inc.*,
    809 F. App'x 863 (Fed. Cir. 2020) ....................................................................22

*Watts v. XL Sys., Inc.*,
    232 F.3d 877 (Fed. Cir. 2000)............................................................................8

### TABLE OF AUTHORITIES (cont'd)

*Williamson v. Citrix Online, LLC*,
   792 F.3d 1339 (Fed. Cir. 2015)............................................................................ *passim*

*WMS Gaming, Inc. v. Int'l Game Tech.*,
   184 F.3d 1339 (Fed. Cir. 1999)...............................................................................27

*WSOU Investments LLC v. Google LLC*,
   No. 6:20-cv-00573-ADA, Dkt. 44 (W.D. Tex. June 2, 2021) (Albright, J.) ....................22, 26

**Statutes**

35 U.S.C. § 112, ¶ 2 ...............................................................................................5

35 U.S.C. Section 112, ¶ 6 ................................................................................. *passim*

## I.      U.S. PATENT NO. 7,333,770 (CASE NO. 6:20-CV-01019) CLAIM TERMS

The '770 patent, entitled "Optimised Data Broadcasting Device in a Telecommunication System," is "intended for broadcasters seeking to increase the effectiveness of their information campaign through improved targeting of the groups of person concerned via a telecommunication network." ('770 patent at 1:13–16).  This is accomplished by "a device for data broadcasting in an access network consisting of several interconnected nodes for transporting fluxes of information elements between content providers and reception terminals." (*Id.* at Abstract).  "The device is implanted at least at one node of the network, and it comprises a circuit managing the profile of the node … configured by an operator of the network or of the node … on the basis of objective or even subjective criteria and a mechanism filtering broadcast information elements which controls a switch … so as to filter said information elements." (*Id.*).

The sole figure of the patent describes the invention in a diagram illustrating the installation of the device (i.e., "a filter mechanism") in an access network node:



(*Id.* at Fig. 1 (annotated)).  Through this filtering mechanism, which is implanted on at least one network access node (and a switch that is controlled by the filtering mechanism), information from the content providers is filtered.

## A.    "broadcast"/"broadcasting" (claims 1–5, 7, 11–14, and 16–18)

| WSOU's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| No construction necessary | Transmitting information to multiple receiver terminals using push techniques |

Claims 1–5, 7, 11–14, and 16–18 each include the term "broadcasting" or "broadcast," such as:

- Claim 1: "A device for ***broadcasting*** information in an access network comprising a plurality of interconnected nodes configured for conveying streams of information items between information content providers and receiver terminals, characterized in that said device is installed in one or more network nodes and comprises a node profile management circuit configured by an operator of the network or an operator of the node as a function of objective or subjective criteria and a mechanism configured for filtering ***broadcast*** information items that controls a switch to filter said information items."

- Claim 7 and 16: "A ***broadcast*** network having a plurality of nodes,"

Defendant's proposed construction of "broadcasting"/"broadcast" reflects the plain and ordinary meaning of the term, including as demonstrated by how the inventors used the term throughout the '770 patent and during prosecution.  In view of the clear intrinsic evidence of the '770 patent, broadcasting as used in the claimed invention mandates that the casting (transmission) of information to a broad group (i.e., receiver terminals) and is performed using push techniques (i.e., without using pull techniques).  Defendant's construction is appropriate and required, for several reasons.

First, the language of the claim language itself, "broadcast" (or "broadcasting"), plainly means to "cast" or transmit information "broadly" or to cast or transmit information to a "broad" group; hence, "broadcasting."

Second, the '770 patent specification confirms that "broadcast"/"broadcasting" means transmission using "push" rather than "pull" techniques.  The patent describes two methods for

broadcasters of "information campaigns."  Specifically, the '770 patent specification distinguishes between broadcasting using "push" techniques and broadcasting using "pull" techniques.  ('770 patent at 1:31–55).  It is clear that the claimed invention is limited to only broadcasting using "push" techniques.

"Push" techniques consist of "broadcasting widely the information that it [a content provider] wishes to transmit."  ('770 patent at 1:38–40).  The use of "widely" is consistent with the plain meaning of "broadcast," which as noted above, means to cast information "broadly."  The patent describes that "[r]adio and television are excellent examples of the applications of push information broadcasting techniques" ('770 patent at 1:42–44), and "a person receiving information via this kind of communication channel is faced with a large amount of information that is not necessarily of interest to him" ('770 patent at 1:51–54).

"Pull" technique is where "a content provider makes information that it wishes to transmit available in a database.  Customers access the information after finding out the address of the database."  ('770 patent at 1:19–22).  The patent explains that pull techniques are not suitable for broadcasting because "[t]hey can be used only on condition that the user has been advised beforehand of the existence of the information made available on the network.  ('770 patent at 1:31–37).

Third, the prosecution history confirms that the claims are limited to "push" techniques.  The prosecution history may "inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005); *see also Chimie v. PPG Indus., Inc.*, 402

F.3d 1371, 1384 (Fed. Cir. 2005) ("The purpose of consulting the prosecution history in

construing a claim is to exclude any interpretation that was disclaimed during prosecution.").

To gain allowance of the patent, the Applicant distinguished the claimed invention from

devices using "pull" techniques.  In particular, the Applicant argued that the prior art ("Minborg"

reference) disclosed only "pull" techniques related to only "a two-party conversation:"

> Minborg discloses a method and apparatus for information
> exchange in a communication network…. However, Minborg does
> not disclose anything more than a two-party conversation, and does
> not include broad items, or broadcast filter items. Further, Minborg
> does not disclose or even suggest "push" technology, and further
> discloses that the display of information to the B-party may be
> made dependent on the A-party. Applicant respectfully submits
> that Minborg cannot be considered to be directed to 'push'
> technology.

(Ex. 1; '770 file history, 1/3/07 Response to Office Action at 9).  The Applicant emphasized the

party-to-party nature of the communications, namely, that between A-party and B-party.

The Applicant reiterated that Minborg only applied to "pull" techniques, the "opposite

technology" of the claimed "push" device for broadcasting information:

> Applicant respectfully submits that Minborg fails to disclose all of
> the features recited in independent claim 1.  For example, but not
> by way of limitation, applicant respectfully submits that Minborg
> fails to disclose "a device for broadcasting information in an access
> network," as recited in claim 1.  As explained above, Minborg
> discloses pull technology ***instead of push technology (i.e.,***
> ***broadcasting)***.  Thus, applicant respectfully submits that Minborg
> ***is directed to the opposite technology of the claimed invention.***

(*Id.* at 9 (emphasis added)).  Finally, the Applicant repeatedly summarized that "Minborg is not

directed to broadcasting and thus does not disclose broadcasting information items."  (Ex. 1;

'770 file history, 1/3/07 Response to Office Action at 13, 17).

The Applicant repeated these very same points in a Pre-Conference Appeal Brief and

pointed out that push technology is "the opposite technology of the claimed invention:"

Applicant disagrees with the Examiner's assertion that Minborg is directed to broadcast technology, and instead believes that Minborg is only directed to 'pull' technology…. ***Minborg discloses pull technology instead of push technology (i.e., broadcasting) - the opposite technology of the claimed invention***.

(Ex. 1; '770 file history, 3/8/07 Pre-Appeal Brief Request for Review at 2) (emphasis added).

In view of the clear intrinsic evidence, broadcast/broadcasting should be interpreted to mean using push techniques to transmit the same information to multiple receiver terminals.

**B.**     **"as a function of objective or subjective criteria" (claims 1, 2, 11, and 18)**

| WSOU's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| No construction needed | Indefinite |

The language, "as a function of objective or subjective criteria," is indefinite under Section 112, ¶ 2.

The phrase, "a function of objective or subjective criteria" has no plain and ordinary meaning.  Instead, the phrase is so broad (and subjective, and the claims in fact use the word "subjective") as to make it indefinite under 35 U.S.C. § 112, ¶ 2.  Because patent claims are to perform the fundamental function of delineating the scope of the invention, the purpose of the definiteness requirement is to ensure that the claims use language that adequately notifies the public of the inventor's rights to exclude.  *Honeywell Int'l, Inc., v. Int'l Trade Commission*, 341 F.3d 1332, 1338 (Fed. Cir. 2003); *see also Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).  Here, the public, upon reviewing the phrase, "a function of objective or subjective criteria," would have no idea as to the scope of the claim.  A person of ordinary skill reading this claim is left to wonder which criteria *is* "a function of objective or subjective criteria" and which criteria *is not* "a function of objective or subjective criteria."  *See Bushnell Hawthorne, LLC v. Cisco Sys., Inc.*, 813 F. App'x 522, 526 (Fed. Cir. 2020).

In evaluating whether "a function of objective or subjective criteria" is so broad and subjective as to make the claim indefinite, the Court should examine the intrinsic evidence for any description which would add meaning to its scope.  The intrinsic evidence here, however, adds no meaning to the scope.

Indeed, the patent specification merely adds to the confusion.  Rather than helping to delineate the scope of what is or isn't "a function of objective or subjective criteria," the specification further muddles the claim boundaries by saying that one type of criteria can even temporarily transform into another – *i.e.*, "subjective criteria can become objective criteria *temporarily*" and by using the term "etc.":

- "These criteria are established by synthesizing profiles of users connected to the network output node. Accordingly, in some cases, ***subjective criteria can become objective criteria temporarily***. This applies in particular in the situation where each user connected to the output node of the network has the same characteristic corresponding to a subjective criterion." ('770 patent at 2:25–31 (emphasis added)).

-  "Filtering is therefore effected on the basis of objective criteria such as geographical location, climate, language, ***etc***." ('770 patent at 2:21–22 (emphasis added)).

- "Filtering can be based on subjective criteria such as professional situation, leisure activities, user's interests, ***etc***." ('770 patent at 2:23–24 (emphasis added)).

- "The ***subjective filtering criteria*** include, for example, civil and family status, profession, leisure activities, interests, ***etc***.  Once again, this list is in no way limiting on the invention and is provided merely by way of example." ('770 patent at 4:20–23 (emphasis added)).

As seen, the term "a function of objective or subjective criteria" depends on the personal preferences of "an operator of the network or an operator of the node," as recited in claim 1. How can a claim limitation take into account whether something is fact (objective) or subjective (opinion)?  Indeed, different people will have different interpretations of both objective criteria and subjective criteria.  It is well established that the meaning of a claim limitation "cannot depend on the undefined views of unnamed persons, even if they are experts, specialists, or academics." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1352 (Fed. Cir. 2005).

Because the phrase is "highly subjective and, on its face, provides little guidance to one of skill in the art," it is indefinite.  *Intellectual Ventures I LLC v. T-Mobile USA, Inc.*, 902 F.3d 1372, 1381 (Fed. Cir. 2018).  Therefore, the subject claims are indefinite because the phrase, "a function of objective or subjective criteria," when viewed in light of the specification, fails to "inform those skilled in the art about the scope of the invention with reasonable certainty."  *Nautilus*, 572 U.S. at 910.

### C.    "filter mechanism" (claims 1, 7, 11, 13, and 16)

| WSOU's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| No construction needed | 35 U.S.C. 112, ¶ 6 applies <br><br> Functions: filtering broadcast information items that controls a switch to filter said information items (claim 1); receiving managed profile information from the circuit and broadcasting information and routing information associated with the input information streams (claims 7 and 16) <br><br> Structure: Insufficient structure (no algorithm); indefinite |

The asserted '770 patent claims recite various "mechanisms" for filtering, as follows:

- Claim 1: "a ***mechanism configured for filtering*** broadcast information items that controls a switch to filter said information items"

- Claims 7 and 16: "a ***filter mechanism*** configured to receive said managed profile information from said circuit and broadcasting information and routing information associated with said input information streams"

These "filter mechanism" terms are subject to means-plus-function treatment because they are nonce terms that do not connote sufficient structure.  The terms are also indefinite because the '770 does not disclose sufficient corresponding structure for the recited functions.

In determining whether a claim term invokes Section 112, ¶ 6, the essential inquiry is "whether the words of the claim are understood by [POSITAs] to have a sufficiently definite meaning as the name for structure." *Williamson v. Citrix Online*, *LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015). Although absence of the word "means" creates a rebuttable presumption that a term is not a means-plus-function term, "the presumption can be overcome and § 112, para. 6 will apply if the challenger demonstrates that the claim term fails to 'recite[ ] sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'" *Watts v. XL Sys., Inc.,* 232 F.3d 877, 880 (Fed. Cir. 2000). The Federal Circuit has explained in this regard that "[g]eneric terms such as 'mechanism,' 'element,' 'device,' and other nonce words that reflect nothing more than verbal constructs may be used in a claim in a manner that is tantamount to using the word 'means' . . . and therefore may invoke § 112, para. 6." *Williamson*, 792 F.3d at 1350.

Here, each of the "mechanism" limitations in claims 1, 7, and 16 merely use functional language akin to mean-plus-function language, with the nonce word "mechanism" simply substituting for "means"—"a *mechanism configured for* filtering" (claim 1) and "*a filter mechanism configured to*" (claims 7 and 16). *See Williamson,* 792 F.3d at 1350. The word "mechanism" does not provide any indication of structure because it sets forth the same black-box recitation of structure for providing the same specified function as if the term "means" had been used. The claims merely say what the "mechanism" does—*e.g.,* "controls a switch to filter [broadcast] information items*,* enables the device to "receive … managed profile information from [the] circuit and broadcasting information and routing information associated with said input information streams,"—rather than what it is. ('770 patent at claims 7 and 16).

The prefix "filter," as used in claims 7 and 16, also does not impart sufficiently definite structure into the term "mechanism."[2]  Although the term "filter mechanism" is used in the specification, the written description fails to impart any structural significance to that term. Instead, it depicts the "filter mechanism" as *literally* nothing more than a black box (*see, e.g.,* '770 patent, Fig. 1 below), and simply describes what the mechanism does—and not what it is— using functional language similar to what is found in the claims.



(*Id.* at Fig. 1; *see also id.* at 3:41–56, 4:4–60, 5:25–27).

Nothing in the intrinsic evidence supports construing the "filter mechanism" expression as the name of a sufficiently definite structure so as to take the claim limitation out of the ambit of § 112, ¶ 6.  Because the '770 patent's "'[m]echanism' terms are defined solely by the fact that

---

[2]    The mere presence of "modifiers" and "prefixes," such as "filter," "retransmission," and "synthesizing" by themselves do not connote definiteness for "a communication interface" and "a priority computation module." *See e.g., Williamson*, 792 F.3d, 1351; *Optis Wireless Tech., LLC v. Huawei Device Co.*, No. 2:17-cv-123-JRG-RSP, 2018 WL 476054, at *32 (E.D. Tex. Jan. 18, 2018); *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, No. 2:14-cv-0912-JRG-RSP, 2015 WL 6746910, *8–9 (E.D. Tex. Nov. 4, 2015); *Rockwell Automation, Inc. v. 3-S Smart Software Solutions, GmbH*, No. 2:15-cv-1543-JRG-RSP, 2016 WL 5811485, *38 (E.D. Tex. Oct. 5, 2016); *Cypress Lake Software, Inc. v. ZTE (USA) Inc.*, No. 6:17-cv-00300-RWS, 2018 WL 4035968, *14 (E.D. Tex. Oct. 23, 2018).

they perform the functions recited in the claims," they therefore do not connote sufficient structure. *Alacritech, Inc. v. Century Link Commc'ns LLC*, 271 F. Supp. 3d 850, 888 (E.D. Tex. 2017). The "mechanism" terms thus invoke Section 112, ¶ 6.

In construing a means-plus-function claim term, after the court identifies the claimed function or functions, the court must next determine what structure, if any, is disclosed in the specification that corresponds to the claimed function(s). *Noah Sys., Inc. v. Intuit Inc.,* 675 F.3d 1302, 1311 (Fed. Cir. 2012). Where there are multiple claimed functions, the patentee must disclose adequate corresponding structure to perform ***all of the claimed functions***. *Williamson* at 1318–19. If the applicant fails to disclose adequate corresponding structure, the claim is indefinite. *Id.* at 1311–12.

Here, the claims recite the following functions to be performed by the "mechanism configured for filtering" (claim 1) and "filter mechanism" (claims 7 and 16):

- "filtering broadcast information items that controls a switch to filter said information items;" (claim 1)

- Receiv[ing] said managed profile information from said circuit and broadcasting information and routing information associated with said input information streams;" (claims 7 and 16)

- controlling a "switch configured to control transmission of information items of said  upstream node for storage in a cache memory" (claim 7)

- control[ling] a "switch configured to control retransmission of information items of said input information streams whose broadcasting criteria correspond to criteria of the profile of the downstream node" (claim 16)

As to the corresponding structure, just like the insufficient structural language present in the claim language itself, the specification describes the filter mechanism using functional language that generally mirrors the language of the claims, explaining that it "receives as input the node profile…as well as broadcasting criteria and routing constraints" and then "controls a

switch" ('770 patent at 3:41–48, 4:4–60), and that a "mechanism 6 for filtering broadcast information items that controls the switch 5 to filter the information items." (*Id.* at 5:25–27).  As noted above, the mechanism is simply depicted as a black box in the patent's sole figure.

Moreover, where, as here, the relevant functions are plainly implemented in a special purpose computer, the Federal Circuit requires that the corresponding structure disclosed in the specification be more than a general purpose computer or microprocessor.  *See*, *e.g., Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.,* 521 F.3d 1328, 1333 (Fed. Cir. 2008) (citing *WMS Gaming, Inc. v. Int'l Game Tech.,* 184 F.3d 1339 (Fed. Cir. 1999)).  In particular, the specification must disclose an algorithm for performing the claimed functions.  *Net MoneyIN, Inc. v. VeriSign, Inc.,* 545 F.3d 1359, 1367 (Fed. Cir. 2008).

No such algorithm is disclosed in the '770 specification.  Rather, the type of purely functional language used, "which simply restates the function associated with the means-plus-function limitation, is insufficient to provide the required corresponding structure."  *Noah Sys.,* 675 F.3d at 1317.  The '770's filter "mechanism" terms should thus be found indefinite.

### D.     "retransmission mechanism" (claims 3, 7, and 15–16)

| WSOU's Proposed Construction | Defendant's Proposed Construction |
| --- | --- |
| No construction needed | 35 U.S.C. Section 112, ¶ 6 applies<br><br>Function: retransmitting the stored information items to the downstream node as a function of commands associated with said input information streams<br><br>Structure: Insufficient structure (no algorithm); indefinite |

The '770 patent claims recite various "mechanisms" for retransmitting information, as follows: such as:

- Claim 7: "a ***retransmission mechanism*** configured to retransmit said stored information items [in a cache memory] to said downstream node as a function of commands associated with said input information streams."

- Claim 3: "a ***mechanism configured for retransmitting*** said stored information items [in a cache memory]."

Similar to the analysis above for the filter "mechanism," the intrinsic evidence establishes that "retransmission mechanism" should be interpreted as a means-plus-function term. "Mechanism" is a nonce word that does not connote sufficient structure and, in the case of claim 7, the prefix "retransmission" does not add anything to "mechanism" to create sufficient structure. The claims and specification merely state what the "retransmission mechanism" does, *i.e.*, retransmits stored information, without reciting any structure. In particular, the specification describes the retransmission mechanism only by using functional language that parrots the functional language found in the claims—*i.e.*, "retransmitting said stored information items" that "operates as a function of commands associated with the stream of information incoming to the node." ('770 patent at 3:49–54; *see also* 2:52-55, 4:61–63).

The recited functions for the retransmission "mechanism" are "retransmit[ing] said stored information items [in a cache memory] to said downstream node as a function of commands associated with said input information streams" (claim 7) and "retransmitting said stored information items [in a cache memory]" (claim 3).

The specification does not provide any corresponding structure to perform these recited functions, let alone an algorithm that explains how transmitting is conducted or what to do with the "commands associated with the input information streams." Just as with the "filter mechanism," the retransmission mechanism is literally depicted using a black box labeled "retransmission mechanism" in Fig. 1, with no other figures or description to provide structure or

information about the claimed "retransmission mechanism."  The retransmission mechanism

terms should thus be found indefinite.

E.      "synthesizing mechanism" (claims 2, 7, 10, and 18)

| WSOU's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| No construction necessary | Section 112, ¶ 6 applies<br><br>Function: synthesizing the profile information and supply the synthesized information to a circuit configured to manage the profile information<br><br>Structure: Insufficient structure (no algorithm); indefinite |

Claims 2, 7, 10, and 18 recite "mechanisms" for synthesizing information.  Exemplary

usage of the term can be found in the following claims:

- Claim 7: "a *synthesizing mechanism* that receives profile information about the downstream node, and is configured to synthesize said profile information and supply said synthesized information to a circuit configured to manage said profile information"; and

- Claim 2: "*a mechanism configured for synthesizing* downstream node profiles configured for automatically updating the node profile management circuit in which said broadcasting device is installed as a function of subjective criteria."

Like the other "mechanism" terms, the terms reciting a "synthesizing mechanism" is

indefinite for insufficient disclosure of corresponding structure for the recited functions.

"Mechanism," as explained above, is a nonce word that does not connote sufficient

structure and, in the case of claim 7, the prefix "synthesizing" does not add anything to

"mechanism" to create sufficient structure.  The claims and specification merely state what the

"synthesizing mechanism" does without reciting any structure.  In particular, the specification

describes the synthesizing mechanism only by using functional language that parrots the

functional language found in the claims—*i.e.*, "synthesizing the profiles of the downstream nodes." ('770 patent at 2:25–26, 2:47–51, 3:29–34, 3:38–41, 3:64–67).

The recited functions for the synthesizing "mechanism" are "receiv[ing] profile information about the downstream node, and … synthesiz[ing] said profile information and supply[ing] said synthesized information to a circuit configured to manage said profile information" (claim 7) and "synthesizing downstream node profiles configured for automatically updating the node profile management circuit in which said broadcasting device is installed as a function of subjective criteria" (claim 2).

The specification does not provide sufficient corresponding structure to perform these recited functions. No algorithm is disclosed that explains how the claimed synthesizing functions are conducted. Just as with the filter and retransmission mechanisms, the synthesizing mechanism is literally depicted using a black box labeled "downstream node profile synthesizer" in Fig. 1, with no other figures to provide structure or information about the claimed "synthesizing mechanism." The term "synthesizing mechanism" should thus be found indefinite.

## II.     U.S. PATENT NO. 8,774,790 (CASE NO. 6:20-CV-01020) CLAIM TERMS

The '790 patent is entitled "Method and Apparatus for Improving Wireless Network Reliability." The patent generally relates to "a method and apparatus for reconfiguring a first base station element to attempt to serve at least a portion of the plurality of wireless terminals served by a second base station element in response to detection of a failure condition at a second base station element that was serving the plurality of wireless terminals prior to the occurrence of the failure condition." ('790 patent at Abstract). What the '790 describes is simple: a base station, which is serving a plurality of wireless terminals, fails. Another base station reconfigures itself, to attempt to serve those plurality of wireless terminals.

To perform this "reconfiguring" function, the specification discloses a "reconfiguration *module* 905" depicted in Fig. 9 (annotated in red below) as part of a "high-level block diagram of a general-purpose computer suitable for use in performing the functions described herein." ('790 patent at 13:27–37). The patent further discloses that "[i]t should be noted that the present invention may be implemented in software and/or in a combination of software and hardware, e.g., using application specific integrated circuits (ASIC), a general purpose computer or any other hardware equivalents." (*Id*. at 13:38–42).



FIG. 9

The bodies of independent claims (claims 1, 14, 19, and 20) are identical (color coding illustrating identity across rows for claim limitations)—only the preambles differ:

| Independent Claim 1 | Independent Claim 14 | Independent Claim 19 | Independent Claim 20 |
|---|---|---|---|
| A method, comprising: | A base station element comprising a processor configured for: | A tangible and non-transient computer readable storage medium storing instructions which, when executed by a computer, adapt the operation of the computer to provide a method, comprising: | A computer program product wherein computer instructions, when executed by a processor in a base station element, adapt the operation of the base station element to provide a method, comprising: |
| at a base station element, in response to an indication of a failure condition associated with another base station element serving a plurality of wireless terminals, performing a self-reconfiguration according to a reconfiguration solution; | at the base station element, in response to an indication of a failure condition associated with another base station element serving a plurality of wireless terminals, performing a self-reconfiguration according to a reconfiguration solution; | at a base station element, in response to an indication of a failure condition associated with another base station element serving a plurality of wireless terminals, performing a self-reconfiguration according to a reconfiguration solution; | at a base station element, in response to an indication of a failure condition associated with another base station element serving a plurality of wireless terminals, performing a self-reconfiguration according to a reconfiguration solution; |
| said reconfiguration solution adapted to reconfigure the base | said reconfiguration solution adapted to reconfigure the base | said reconfiguration solution adapted to reconfigure the base | said reconfiguration solution adapted to reconfigure the base |

| | | | |
|---|---|---|---|
| station element to serve a portion of the plurality of wireless terminals, wherein the reconfiguration solution depends on a type of the failure condition; | station element to serve a portion of the plurality of wireless terminals, wherein the reconfiguration solution depends on a type of the failure condition; | station element to serve a portion of the plurality of wireless terminals, wherein the reconfiguration solution depends on a type of the failure condition; | station element to serve a portion of the plurality of wireless terminals, wherein the reconfiguration solution depends on a type of the failure condition; |
| at the base station element, upon completion of the self-reconfiguration, initiating communication with each of the portion of wireless terminals to provide thereby a respective continuity of service. | at the base station element, upon completion of the self-reconfiguration, initiating communication with each of the portion of wireless terminals to provide thereby a respective continuity of service. | at the base station element, upon completion of the self-reconfiguration, initiating communication with each of the portion of wireless terminals to provide thereby a respective continuity of service. | at the base station element, upon completion of the self-reconfiguration, initiating communication with each of the portion of wireless terminals to provide thereby a respective continuity of service. |

**A.** **"said reconfiguration solution *adapted to* reconfigure the base station element to serve a portion of the plurality of wireless terminals, wherein the reconfiguration solution depends on a type of the failure condition" (claims 1, 14, 19, and 20)**

| WSOU's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary | 35 U.S.C. § 112, ¶ 6 applies <br><br> <u>Function</u>: reconfiguring the base station element to serve a portion of the plurality of wireless terminals <br><br> <u>Structure</u>: Insufficient structure (no algorithm); indefinite |

"Reconfiguration solution" is subject to means-plus-function treatment because there is no sufficiently definite structure for performing the recited function.  *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015).  Indeed, "reconfiguration solution" connotes no more structure than if the term was replaced with "means" whereby the "reconfiguration solution" is "adapted to" perform the function to "reconfigure the base station element to serve a portion of the plurality of wireless terminals."

The term "solution" is nothing more than a generic "black box" for performing the recited computer-implemented functions and operates like "means" to claim a particular function rather than describe a sufficiently definite structure.  Generic terms such as "mechanism," "element," "device," and other nonce words (like "solution" here) that reflect nothing more than

verbal constructs may be used in a claim in a manner that is tantamount to using the word

"means" because they "typically do not connote sufficiently definite structure" and therefore

may invoke § 112, para. 6.  *Williamson*, 792 F.3d at 1350; s*ee also Advanced Ground Info. Sys.,*

*Inc. v. Life360, Inc*., 830 F.3d 1341, 1347 (Fed. Cir. 2016) ("symbol generator" is subject to

means-plus-function treatment).

 Here, as in *Williamson*, the claims are written "in a format consistent with traditional

means-plus-function claim limitations," and define the "reconfiguration solution" solely in

relation to its function.  *Williamson*, 792 F.3d at 1350; *see also Sarif Biomedical LLC v.*

*Brainlab, Inc.*, No. 13–846–LPS, 2015 WL 5072085, at *5–7 (D. Del. Aug. 26, 2015) (finding

"computer adapted to [perform various functions]" does not sufficiently define structure so 112

¶ 6 treatment is appropriate and indefinite for failure to disclose an algorithm); *see also Dyfan,*

2020 WL 8617821, at *6 (finding means-plus-function applied because term in dispute was

"defined only by the function it performs").  Dependent claims 4 and 5 add even more functions

for the "reconfiguration solution" without shedding any light on its structure.

 The prefix "reconfiguration" here "does not impart structure" into the term "solution"

beyond anything that is purely functional and "do[es] not describe a sufficiently definite

structure."  *Williamson*, 792 F.3d at 1351 ("While [it] is correct that the presence of modifiers

can change the meaning of 'module,' the presence of these particular terms does not provide any

structural significance to the term 'module' in this case."); *see also Rain Computing, Inc. v.*

*Samsung Elecs. Am., Inc.*, 989 F.3d 1002, 1006 (Fed. Cir. 2021) (finding prefix "user

identification" in the term "user identification module" failed to impart structure, "as it merely

described the function of the module").

And the claims describe "reconfiguration solution" as a function that "depends on the *type* of failure condition," which highlights in the intrinsic evidence the lack of sufficient structure. The claims do not disclose what is a "type" of failure condition.[3] Likewise, the specification does not disclose what is a "type," but rather failure conditions generally and thus does not provide any structure. The specification describes that a failure condition is detected by a "failure defection module": "At step 704, a *failure condition* is detected at a base station element. In one embodiment, the *failure condition* is detected by the base station element on which the *failure condition* occurs using at least *one failure detection module*." ('790 patent at 8:11–17 (emphasis added)). Merely reciting function fails to "inform the structural character of the limitation-in-question or otherwise impart structure." *Williamson*, 792 F.3d at 1351.

Moreover, the preambles do not provide sufficient structure, instead of listing general computer components, such a processor, software, or software running on a computer, further connoting means-plus-function treatment. *See Konami Gaming*, 2018 WL 1020120, at *12–14 (claims containing the terms "processor" and "non-transitory computer readable medium" fail to provide sufficient structure are subject to means-plus-function treatment).

- Claim 14: "A base station element comprising a ***processor configured for***: [recited functions]"

- Claim 19: "A ***tangible and non-transient computer readable storage medium storing instructions***, which, when executed by a computer, adapt the operation of the computer to provide a method, comprising: [recited functions];" and

- Claim 20: "***A computer program product*** wherein computer instructions, when executed by a ***processor in a base station element***, adapt the operation of the base station element to provide a method, comprising: [recited functions]."

---

[3]   The Applicants amended the originally filed claims to add "wherein the reconfiguration solution depends on a type of the failure condition" in response to an Office Action (*see* Ex. 2; '790 file history, 8/28/08 Response to Office Action at 2, 4, and 6), and as a means to overcome prior art references (*id*. at 9-10 (arguing prior art reference William does not teach this limitation); *see also* Ex. 2; '790 file history, 4/13/09 Response to Office Action at 13 ("Therefore, Stanwood fails to teach or suggest that the configuration solution is based on a type of the failure condition as required by claim 19.").

The specification also fails to impart any structural significance to the term.  The '790 patent provides only generic references with no specific details concerning the "reconfiguration solution," such as details on how the solution is implemented—stating only that a "solution" is performed using generic software (or software running on hardware) for performing numerous tasks.  This is insufficient structure.  *Media Rights Techs., Inc. v. Capital One Financial Corp.*, 800 F.3d 1366, 1372–73 (Fed. Cir. 2015) (finding depictions in specification of connections to parts of the system, functionality, and functional components insufficient to avoid means-plus-function treatment); *Fiber, LLC v. Ciena Corp.*, 792 F. App'x 789, 794–95 (Fed. Cir. 2019) (finding figures showing "a generic box with no indication of any structure" and that means-plus-function applied).  Fig. 9 (reproduced above) illustrates this lack of structure, using just a black box for reconfiguration module 905 and then describing it generically as being loaded into memory and executed by a processor:

> It should be noted that the present invention may be implemented in software and/or in a combination of software and hardware, e.g., using application specific integrated circuits (ASIC), a general purpose computer or any other hardware equivalents.  In one embodiment, the **reconfiguration module or process 905** can be loaded into memory 904 and executed by processor 902 to implement the functions discussed herein.  As such, **reconfiguration process 905 (including associated data structures)** of the present invention can be stored on a computer readable medium or carrier, e.g., RAM memory, magnetic or optical drive or diskette and the like.

('790 patent at 13:38–48 (emphasis added)).  Aside from the "reconfiguration module," the specification only describes the "reconfiguration solution" by its functionality.  (*See, e.g.*, *id.* at 6:21–26, 7:15–20, 7:51–56, 8:44–58 ("reconfiguration solution includes at least one reconfiguration action"), 9:1–5, 9:9–14, 9:49–62, 9:63–10:12, 10:23–25, 10:27–29, 10:46–48, 10:63–11:7, 11:8–21, 11:22–35, 11:36–48, 11:49–59, 11:61–12:6, 12:7–19, 12:20–31, 12:44–

58).  The specification thus confirms that the "reconfiguration solution" is nothing more than generic structure—hardware and/or software—"to perform the steps and/or functions described" in the specification, which in fact uses the term "module"—a nonce word.  *Williamson*, 792 F.3d at 1350 ("'[M]odule' is simply a generic description for software or hardware that performs a specified function.").  Thus, the specification does not describe "reconfiguration solution" to be "the name of a sufficiently definite structure," rendering means-plus-function treatment. *Williamson*, 792 F.3d at 1351.

Moreover, the Applicants clearly meant for means-plus-function treatment to apply to the claims, as confirmed during prosecution.  Many of the originally filed claims were cast in means-plus-function format to include "means for" reconfiguring the base station element.  (*See, e.g.*, Ex. 2; '790 file history, 2/15/06 Application, claim 11 ("***means for***, in response to detection of a failure condition, triggering a second base station element ***to attempt to reconfigure itself*** to be better able to serve at least a portion of the plurality of wireless terminals…"); *see also* claims 12, 13, 14 ("[t]he apparatus of claim 13, wherein the ***means for*** reconfiguring the second base statement element comprises: ***means for*** increasing a power level …."), 15, 17, and 21).[4]  And in a series of appeal briefs before the Patent Trial and Appeal Board ("PTAB"), the Applicants argued the inapplicability of prior art based on "means for" language because the "[t]he structures disclosed by the Applicant cannot be disregarded."  (*See, e.g.*, Ex. 2; '790 file history, 9/15/09 Appeal Brief at 12 and 14 (under heading "Specific Structure described in specification

---

[4]    *See also* Ex. 2; '790 file history, 4/13/09 Response to Office Action, claim 12 ("The apparatus of claim 11, wherein the ***means for*** triggering comprises: ***means for determining the reconfiguration solution***.").

must be considered," asserting that the "means" language in the claims distinguishes over the prior art because "[t]he structures disclosed by the Applicant cannot be disregarded."))[5]

At the end of prosecution, the Applicants filed a Request for Continued Examination ("RCE") and cancelled the entire set of pending claims with the goal of removing all references to "means for." (*See* Ex. 2; '790 file history, 11/19/13 RCE Amendments (cancelling pending claims 1-21 and replacing with new claims 22–41 (issued as claims 1–20))). The Examiner allowed the amendment because earlier the PTAB had found the claims patentable over an unrelated limitation. (*See* Ex. 2; '790 file history, 3/4/14 Notice of Allowability at 2 ("The following is an examiner's statement of reasons for allowance: Claims 22–41 are allowable in view of the decision on appeal rendered by the patent trial and appeal board on June 14, 2013."); *see also* Ex. 2; '790 file history, 6/14/13 PTAB Decision at 3–5 (finding the prior art reference did not disclose the last element of the claims related to base element initiating communications with the wireless terminals)). Although applicants managed to swap the pending claims to erase "means for," means-plus-function treatment clearly applies here.

Because means-plus-function treatment applies, and the specification fails to disclose sufficient structure for the function of "reconfiguration solution," the claims are indefinite. As discussed, the specification discloses that the "reconfiguration solution" is a "reconfiguration module or process 905" that "can be loaded into memory 904 and executed by processor 902 to implement the functions discussed herein." ('790 patent at 13:42–45). As such, the

---

[5]   *See also* Ex. 2; '790 file history, 9/15/09 Appeal Brief, claim 11 ("***means for*** triggering, upon detecting the failure condition, a second base station element to self-reconfigure according to a ***reconfiguration solution adapted to reconfigure the second base station element*** to serve at least a portion of the plurality of wireless terminals served by the first base station element prior to the occurrence of the failure condition …"), claim 21 ("***means for*** determining a ***reconfiguration solution adapted to reconfigure*** at least one other base station element for serving at least a portion of the plurality of wireless terminals previously served by the first base station element …"); Ex. 2, '790 file history, 3/4/10 Appeal Reply Brief at 16–18 (same).

"reconfiguration solution" is a general-purpose computer or processor, which alone is insufficient structure here.  *See EON Corp. IP Holdings LLC v. AT&T Mobility LLC,* 785 F.3d 616, 621 (Fed. Cir. 2015) ("this court has consistently required that the structure disclosed in the specification be more than simply a general purpose computer or microprocessor"); *see also Rain Computing,* 989 F.3d at 1007 (holding that computer-readable media or storage device[s] are not sufficient structure for the "control access" function of "user identification module" because "these computer-readable media or storage devices amount to nothing more than a general-purpose computer").

Further, when the claim requires a computer-implemented function, the corresponding specification must "disclose an algorithm for performing the claimed function."  *Williamson*, 792 F.3d at 1352 (citations omitted); *see also Digital Retail Apps, Inc. v. H-E-B, LP*, No. 6:19-cv-00167-ADA, 2020 WL 376664, at *6 (W.D. Tex. Jan. 23, 2020) ("[O]ne must identify how the software performs the functions by disclosing an algorithm in order to provide structural specificity."); *Function Media, L.L.C. v. Google, Inc.*, 708 F.3d 1310, 1318 (Fed. Cir. 2013).

Here, there is no algorithm disclosed for the claimed function.  This failure to provide an algorithm renders this claim indefinite.  *See Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1332–34 (Fed. Cir. 2008) (finding insufficient "language [that] simply describes the function to be performed, not the algorithm by which it is performed'); *see also Uniloc USA, Inc. v. Samsung Elecs. Am., Inc.*, 809 F. App'x 863, 865–66 (Fed. Cir. 2020) (finding that "the specification merely restates the claimed function" rendering the claims indefinite), *aff'g* No. 2:18-cv-0042-JRG-RSP, 2019 WL 11023944, at *11–13 (E.D. Tex. Apr. 18, 2019); *WSOU Investments LLC v. Google LLC*, No. 6:20-cv-00573-ADA, Dkt. 44 (W.D. Tex. June 2, 2021) (Albright, J.) (finding terms "alerting unit configured to issue an alert" and "a collaborative

application management processor configured to manage collaborative applications" indefinite for failure to disclose an algorithm).

## III.    U.S. PATENT NO. 9,548,977 (CASE NO. 6:20-CV-01021) CLAIM TERMS

The '977 patent is entitled "System, Method, and Apparatus for Performing Reliable Network, Capability, and Service Discovery," and provides for a terminal transmission of ***a request*** to an access point, for "signed access point information."  The request for "signed access point information" can take place before the mobile terminal authenticates with the access point. The request also takes place before the mobile terminal associates with the access point (when authentication is not performed).  The "signed access point information" includes "a random number and at least a vendor specific attribute according to the standard of Wi-Fi Alliance."

The purported invention also requires that the terminal receive ***a response*** (from the access point), which includes signed access point information (with the random number and "a vendor specific attribute according to the standard of the Wi-Fi Alliance").

Therefore, both the ***request*** (to the access point) and the ***response*** (from the access point) include the signed access point information (with the random number and vendor specific attribute according to the Wi-Fi Alliance).  The terminal can also verify the signed access point information using a digital certificate.

### A.    "a vendor specific attribute according to the standard of Wi-Fi Alliance" (claims 1, 5, 10, 11, 13, and 15)

| WSOU's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| No construction necessary | Indefinite |

The subject claims require "a vendor specific attribute according ***the*** standard of Wi-Fi Alliance," but because there is no antecedent basis for "***the*** standard of Wi-Fi Alliance," the claims are indefinite.  *See Halliburton Energy Servs., Inc. v. M-I LLC,* 514 F.3d 1244, 1249 (Fed.

Cir. 2008) (claim is "indefinite if a term does not have proper antecedent basis where such basis is not otherwise present by implication or the meaning is not reasonably ascertainable"); *Bushnell Hawthorne, LLC v. Cisco Sys., Inc.*, 813 F. App'x 522, 526–27 (Fed. Cir. 2020) (claims indefinite when scope could not be reasonably ascertained given lack of antecedent basis). This is far from a case where the meaning of "the standard of Wi-Fi Alliance" is present through implication or is reasonably ascertainable.

The '977 patent specification confirms that the term "the standard of Wi-Fi Alliance" is indefinite. There are few references to "Wi-Fi Alliance" in the specification. The first one refers to different wireless networking "techniques," such as IEEE and Wi-Fi Alliance techniques:

> The mobile terminal may be capable of transmitting and/or receiving data from electronic devices according to various wireless networking techniques, including Wireless Fidelity (Wi-Fi), WLAN techniques such as IEEE 802.11 techniques, IEEE 802.11u techniques, IEEE 802.16 techniques, ***Wi-Fi Alliance (WFA) techniques***, and/or the like.

('977 patent at 6:56–63 (emphasis added)). While the patent specification distinguishes IEEE from Wi-Fi Alliance, it provides no disclosure as to "***the*** standard of Wi-Fi Alliance." In another passage, the specification distinguishes IEEE 802.11u and "vendor specific attributes according to [Wi-Fi Alliance]:"

> The discovery circuitry 128 may further be configured to receive a response to the request from an access point 104. In an example embodiment, the response may be a GAS response according to IEEE 802.11u. In some embodiments, the response may be a vendor specific attribute according to WFA.

(*Id.* at 10:43-48, *see also* 15:17-19 ("The request may be in the form of an 802.1In GAS request, a vendor specific attribute according to WFA, or the like.")). Again, there is no disclosure as to any Wi-Fi Alliance standards.

Other references in the '977 patent specification also do not help.  The specification

indicates that the request may be "a vendor specific attribute according to the Wi-Fi Alliance

(WFA):"

> According to some example embodiments, the request may be a
> vendor specific attribute *according to the Wi-Fi Alliance (WFA)*.

(*Id.* at 10:1–4 (emphasis added)).  Although this passage says, "[a]ccording to some example

embodiments," there is not a single embodiment that refers to the Wi-Fi Alliance, let alone any

standard of the Wi-Fi Alliance or "*the* standard of Wi-Fi Alliance."

As can be seen from the claims and patent specification, the meaning of "the standard of

Wi-Fi Alliance" is not present through implication and is not reasonably ascertainable.

The prosecution history also does not provide any meaning for "the standard of the Wi-Fi

Alliance."  Even though the Applicant gained allowance of all the claims upon the addition of

the language, "a vendor specific attribute according to the standard of the Wi-Fi Alliance," the

prosecution history does not explain what that language means.  This claim language was added

at the end of prosecution, when an amendment to the claims was made to overcome a prior art

rejection.  (Ex. 3; '977 file history, 9/19/2016 Notice of Allowance including amendments).

There is no "plain and ordinary meaning" in this circumstance.  *See Nautilus, Inc. v.

Biosig Instruments, Inc.*, 572 U.S. 898, 909 (2014).  Rather, the claims are indefinite.

**B.**    **"one processor; and at least one memory including computer program code, the at least one memory and the computer program code configured to, with the at least one processor, cause the apparatus to perform at least the following:" (claims 5, 11, and 13)**

| WSOU's Proposed Construction | Defendant's Proposed Construction |
| --- | --- |
| No construction necessary | 35 U.S.C. § 112, ¶ 6 applies |
| | Functions: |

|  | providing… for transmission of a request for signed access point information<br><br>receiving … a response for verification; and<br><br>verifying … the signed access point information.<br><br><u>Structure</u>: Insufficient structure (no algorithm); indefinite |
|---|---|

This claim limitation is subject to 35 U.S.C. §112, ¶ 6 and is indefinite because the specification fails to disclose a corresponding structure for the recited functions.

To determine whether Section 112, ¶ 6 applies, the threshold inquiry is "whether the words of the claim are understood by [POSITAs] to have a sufficiently definite meaning as the name for structure." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015). Though absence of the word "means" creates a rebuttable presumption that a term is not a means-plus-function limitation, Section 112, ¶ 6 applies when the claim term: (i) "fails to recite sufficiently definite structure," or (ii) "recites function without reciting sufficient structure for performing that function." *Id*. at 1349.  Importantly, "[t]he question is not whether a claim term recites any structure but whether it recites sufficient structure—a claim term is subject to § 112(f) if it recites function without reciting sufficient structure for performing that function." *Egenera, Inc. v. Cisco Sys., Inc.*, 972 F.3d 1367, 1374 (Fed. Cir. 2020); *see, e.g., WSOU Investments LLC v. Google LLC*, No. 6:20-cv-00573-ADA, Dkt. 44 (W.D. Tex. June 2, 2021) (Albright, J.) (finding the terms "at least one memory and the computer program code are configured, with the at least one processor, to cause the apparatus to at least detect that an application is being started on the apparatus…" as indefinite for failure to disclose an algorithm).

Claim 1's formulaic reference to "processor," "at least one memory," and "computer program code" does not provide sufficient structure to avoid means-plus-function treatment.  As

this Court has explained, applicants cannot "simply recite two nonce words—'processor' and 'code'—together in order to essentially write the claim in a means-plus-function format without being subject to § 112, ¶ 6." *Dyfan, LLC v. Target Corp.*, No. 6:19-cv-00179-ADA, 2020 WL 8617821, at *6 & n.4 (W.D. Tex. Nov. 25, 2020); *see also Konami Gaming, Inc. v. High 5 Games, LLC*, No. 2:14-cv-01483-RFB, 2018 WL 1020120, at *12-14 (Feb. 22, 2018 D. Nev.) (finding claims containing the terms "processor," "memory device," "non-transitory computer readable medium," and "control module" subject to means-plus-function treatment because such terms fail to provide sufficient structure for various recited functions).  The same applies here. The addition of "at least one memory" also does not add any meaningful structure.  The "at least one memory" simply indicates where the "code" is stored—it does not provide sufficient structural specificity to the generic term "computer program code."

The '977 patent does not disclose any structure or algorithm as required to perform the claimed three functions of "provid[ing] for transmission" and "receiv[ing] a response," and "verify[ing] … the signed access."  WSOU cannot identify such structure or algorithm for each of these functions, as nothing in the specification provides sufficient structure.  Rather, the '977 patent depicts, in its figures, the processor as a rectangular box without any structural detail, and states that the processor executes various computer program instructions that are stored in memory.  Entirely absent from the disclosure, and necessary under the law, is a description of algorithms, routines, or instructions by which to perform the claimed functions.  The disclosed structure must be "the special purpose computer programmed to perform the disclosed algorithm."  *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999).  It is equally "well settled that simply disclosing software [ ] without providing some detail about the means to accomplish the function is not enough."  *Function Media, L.L.C. v. Google, Inc.*, 708

F.3d 1310, 1318 (Fed. Cir. 2013); *see also Konami Gaming*, 2018 WL 1020120, at *14-17

(finding indefinite claims related to computing components for performing various recited

functions for failure to disclose an algorithm).

     The specification confirms that a processor, memory, and computer program code are

"black-box placeholders," requiring specific algorithms to perform the recited functions.  Fig. 1,

for example, refers to the placeholder processor 120 and memory 122 (both highlighted in

yellow) in the terminal apparatus:



('977 patent, Fig. 1; *see also id.*, Fig. 3 (schematic block diagram of a mobile terminal)).

     Likewise, Fig. 2 illustrates the placeholder processor 220 and memory 222 (both

highlighted in yellow) in an "access point:"



(*Id.*, Fig. 2).

As for the description in the specification, there are no specific algorithms disclosed to perform the recited functions.  Instead, the specification references generic information:

> The above described functions may be carried out in many ways. For example, any suitable means for carrying out each of the functions described above may be employed to carry out embodiments of the invention. In one embodiment, a suitably configured processor may provide all or a portion of the elements of the invention.  In another embodiment, all or a portion of the elements of the invention may be configured by and operate under control of a computer program product.  The computer program product for performing the methods of embodiments of the invention includes a computer-readable storage medium, such as the non-volatile storage medium, and computer-readable program code portions, such as a series of computer instructions, embodied in the computer readable storage medium.

(*Id*. at 20:19–37; *see also id.* 8:2–10 ("[F]or example, when the processor 120 is embodied as an ASIC, FPGA or the like, the processor 120 may comprise specifically configured hardware for conducting one or more operations described herein.  Alternatively, as another example, when the processor 120 is embodied as an executor of instructions, such as may be stored in the memory 122, the instructions may specifically configure the processor 120 to perform one or more algorithms and operations described herein.")).  Claims 5, 11, and 13 are indefinite.

C.     **"A non-transitory computer-readable storage medium including computer-readable program code, which when executed by at least one processor provides operations comprising:" (claim 10)**

| WSOU's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| No construction necessary | 35 U.S.C. § 112, ¶ 6 applies<br><br>Functions:<br><br>providing… for transmission of a request for signed access point information<br><br>receiving … a response for verification; and |

| | verifying … the signed access point information. <br><br> <u>Structure</u>: Insufficient structure (no algorithm); indefinite |
|---|---|

Claim 10 is also subject to 35 U.S.C. §112, ¶ 6.

The bodies of claims 10 and 5 are identical—the only difference is the preambles.  Claim 10's preamble reads: "A non-transitory computer-readable storage medium including computer-readable program code, which when executed by at least one processor provides operations comprising: …"  Claim 10, however, still refers to the same "means" elements as claim 5—a memory (i.e., "computer-readable storage medium"), "program code," and a processor."  Claim 10 has the identical recited functions as claim 5.

Claim 10 suffers the same flaw as claim 5—it is indefinite.  The '977 patent does not disclose any structure or algorithm to perform the claimed functions of "provid[ing] for transmission" and "receiv[ing] a response," and "verify[ing] … the signed access."  There is no such structure, as explained above.

Dated:  September 2, 2021

Respectfully submitted,

FISH & RICHARDSON P.C.

By: */s/ John T. Johnson*
    David M. Hoffman
    Texas Bar No. 24046084
    hoffman@fr.com
    111 Congress Avenue, Suite 810
    Austin, TX 78701
    Tel: (512) 472-5070
    Fax: (512) 320-8935

    John T. Johnson (*admitted pro hac vice*)
    jjohnson@fr.com
    Jeffrey C. Mok (*admitted pro hac vice*)
    jmok@fr.com
    7 Times Square, 20th Floor
    New York, NY 10036
    Tel: (212) 765-5070
    Fax: (212) 258-2291

    *Attorneys for Defendant,*
    ***TP-LINK TECHNOLOGIES CO., LTD.***

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) on September 2, 2021, and was served via CM/ECF on all counsel who are deemed to have consented to electronic service.  Local Rule CV-5(b)(1).

*/s/ John T. Johnson*
John T. Johnson