**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| WSOU INVESTMENTS, LLC D/B/A BRAZOS LICENSING AND DEVELOPMENT, | |
| Plaintiff | Case No. 6:20-cv-01019 Case No. 6:20-cv-01020 Case No. 6:20-cv-01021 |
| v. | |
| TP-LINK TECHNOLOGY CO., LTD., | JURY TRIAL DEMANDED |
| Defendant | |

**PLAINTIFF'S CLAIM CONSTRUCTION RESPONSE**

TABLE OF CONTENTS

I.   U.S. PATENT NO. 7,333,770 (CASE NO. 6:20-CV-01019) CLAIM TERMS ..................... 1

   A.  Overview and Person of Ordinary Skill in the Art ..................................................... 1

   B.  "broadcast"/"broadcasting" (claims 1–5, 7, 11–14, and 16–18) .................................. 1

      1.   "Multiple" receiver terminals is inconsistent with the plain and ordinary meaning .................................................................................................... 1

      2.   Receiving terminals are not part of the singular "device for broadcasting information" ............................................................................................... 2

      3.   Defendant's proposal, "using push techniques," is already contemplated in claim 1 ............................................................................................................ 3

   C.  "as a function of objective or subjective criteria" (claims 1, 2, 11, and 18) ............... 3

   D.  "filter mechanism" (claims 1, 7, 11, 13, and 16) ......................................................... 4

   E.  "retransmission mechanism" (claims 3, 7, and 15–16) ................................................ 6

   F.  "synthesizing mechanism" (claims 2, 7, 10, and 18) ................................................... 7

II.  U.S. PATENT NO. 8,774,790 (CASE NO. 6:20-CV-01020) CLAIM TERM ......................... 7

   A.  Overview and Person of Ordinary Skill in the Art ..................................................... 7

      1.   "said reconfiguration solution adapted to reconfigure the base station element to serve a portion of the plurality of wireless terminals, wherein the reconfiguration solution depends on a type of the failure condition" (claims 1, 14, 19, and 20) ....................................................................................... 8

III. U.S. PATENT NO. 9,548,977 (CASE NO. 6:20-CV-01021) CLAIM TERMS ................... 10

   A.  Overview and Person of Ordinary Skill in the Art ................................................... 10

   B.  "a vendor specific attribute according to the standard of Wi-Fi Alliance" (claims 1, 5, 10, 11, 13, and 15) ....................................................................................................... 11

      1.   The claim term "a vendor specific attribute …" does not lack antecedent basis ........................................................................................................... 11

      2.   A POSITA would inherently understand "the standard of the Wi-Fi Alliance" and the term does not require an antecedent recitation ............... 11

C.      "one processor; and at least one memory including computer program code, the at least one memory and the computer program code configured to, with the at least one processor, cause the apparatus to perform at least the following:" (claims 5, 11, and 13) ........................................................................................................... 15

D.      "A non-transitory computer-readable storage medium including computer-readable program code, which when executed by at least one processor provides operations comprising:" (claim 10) ...................................................................... 16

TABLE OF AUTHORITIES

Cases

*Atmel Corp. v. Info. Storage Devices, Inc.*,
    198 F.3d 1374 (Fed. Cir. 1999) ........................................................................... 14

*BASF Corp. v. Johnson Matthey Inc.*,
    875 F.3d 1360 (Fed. Cir. 2017) ........................................................................... 15

*Bose Corp. v. JBL, Inc.*,
    274 F.3d 1354 (Fed. Cir. 2001) ........................................................................... 11

*Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.*,
    424 F.3d 1293 (Fed. Cir. 2005) ........................................................................... 11

*CyberSource Corp. v. Retail Decisions, Inc.*,
    654 F.3d 1366 (Fed. Cir. 2011) ........................................................................... 16

*Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*,
    672 F.3d 1270 (Fed. Cir. 2012) ........................................................................... 16

*Greenberg v. Ethicon Endo–Surgery, Inc.*,
    91 F.3d 1580 (Fed.Cir.1996) ............................................................................... 5

*Hill-Rom Servs., Inc. v. Stryker Corp.*,
    755 F.3d 1367 (Fed. Cir. 2014) ........................................................................ 5, 6

*In re Katz Interactive Call Processing Patent Litig.*,
    639 F.3d 1303 (Fed. Cir. 2011) ............................................................................. 8

*Intelligent Automation Design, LLC v. Zimmer Biomet CMF & Thoracic, LLC*,
    799 F. App'x 847 (Fed. Cir. 2020) ........................................................................ 8

*Intelligent Water Sols., LLC v. Kohler Co.*,
    No. 2:16-CV-689, 2017 WL 2444723 (E.D. Tex. June 5, 2017) ........................... 8

*Panoptis Patent Mgmt, LLC, et al., v. Blackberry Ltd.*,
    Case 2:16-cv-62-JRG-RSP, 2017 WL 497571 (E.D. Tex. Feb. 7, 2017) .............. 7

*Typhoon Touch Techs., Inc. v. Dell, Inc.*,
    659 F.3d 1376 (Fed. Cir. 2011) ............................................................................. 8

*Williamson v. Citrix Online LLC*,
    792 F.3d 1339 (Fed. Cir. 2015) ............................................................................. 4

Statutes

35 U.S.C. § 112(6).................................................................................................................5, 6

Other Authorities

MPEP § 2173.05(e) .................................................................................................................11

I.      **U.S. PATENT NO. 7,333,770 (CASE NO. 6:20-CV-01019) CLAIM TERMS**

A.      **Overview and Person of Ordinary Skill in the Art**

The '770 Patent is directed to an optimized data broadcasting device in a telecommunications system. *See* PX 770 ('770 Patent).

For the '770 Patent, a POSITA would be familiar with networking technology (including messaging, communications, filtering, transmission and synthesizing profiles) and the differences between a broadcast message, a multi-cast message and a unicast message.

B.      **"broadcast"/"broadcasting" (claims 1–5, 7, 11–14, and 16–18)**

Defendant proposes "Transmitting information to multiple receiver terminals using push techniques." No construction is necessary, however, because the terms "broadcast" and "broadcasting" are terms that are well-known to a POSITA.

1.      <u>"Multiple" receiver terminals is inconsistent with the plain and ordinary meaning</u>

Defendant's requirement that information be transmitted to "multiple receiver terminals" is incorrect. A broadcast is an operation directed to one or more slaves on one or more segments. PX A (The New IEEE Standard Dictionary of Electrical and Electronics Terms, Fifth Ed. 1993) at 131. Broadcasting is therefore confined to the outbound message, specifically how that message is formatted such that it is addressed in a manner to allow multiple devices to receive it. The broadcast information may be received by zero, one or many recipients. But even if only one recipient receives the broadcast information, it is still broadcasting. For example, if a siren goes off in the woods, and only one person is in range to hear the siren, it is still capable of being heard by others.

1

The problem with Defendant's construction is twofold. *First*, it requires the broadcast message to be *actually received* by multiple devices. That is incorrect because Defendant's construction *requires* actual reception by multiple devices—for broadcasting, the devices may not be there to receive the message but that does not make it not a broadcast message. *Second*, the way Defendant is construing the term, the filter described in claim 1 could not do its job of filtering. If the filter filters information in way that prevents the information from being conveyed to multiple devices, then it would not be infringing. But that cannot be correct because in such an instance, the filter would be just doing its job according to the claim.

Accordingly, a POSITA would understand "broadcasting" information to mean that the information is sent in a format that *could* be received by more than one recipient. There is no requirement in the claim, or in the term "broadcasting" itself suggests that the broadcast information *actually* be received by "multiple" receiving terminals.

2.    <u>Receiving terminals are not part of the singular "device for broadcasting information"</u>

Claim 1 does not require "multiple receiving terminals." The "receiver terminals" are not part of claim. To be sure, claim 1 does not require multiple terminals as part of the claim, but instead is directed "a device for broadcasting information in an access network." *Id*. at 6:30-31. *See also* PX 770 at 6:30-40. The singular "device for broadcasting information" is simply the broadcasting device, and does not include "multiple receiving terminals," as Defendant's construction requires. While "receiver terminals" are described in claim 1, the receiver terminals are characterized as the recipients of the properly formatted broadcast information generated by the "device for broadcasting information" that is comprised of "interconnected nodes configured for conveying streams of information items." *Id*. at 6:30-33. The "receiver terminals" are not part

2

of the "device for broadcasting information." Defendant's proposal improperly expands the device described in claim 1 to include "receiver terminals." Defendant's proposal should be rejected.

3.   Defendant's proposal, "using push techniques," is already contemplated in claim 1.

Defendant's requirement that the term "broadcasting" include "using push techniques" is improper and unnecessary. *First*, it is confusing as to what Defendant's "push techniques" means. The proposal introduces potential indefiniteness. Broadcast information is information sent from one node to other devices. A broadcasting necessarily requires information the act of sending or "pushing" the information from the source to the destination. Defendant's proposal makes it less clear to a jury—it is unclear what a "push technique" entails. Broadcasting is a more understandable term, is understood by a POSITA, and is the word chosen by the patentee. *Second*, the examiner understood the context of "broadcasting" and did not require the addition of the language of only "using a push techniques" because it is encapsulated in the arrangement of the claim. *Compare* Dkt. 35-1 at 16 (claim 1) *with* PX 770 at 6:30-40 (claim 1). Claim 1 of the '770 Patent already captures the broadcasting concept in the way the patent holder intended. Specifically, the "device for broadcasting information" is comprised of "interconnected nodes configured for *conveying* streams of information items." *Id*. at 6:30-33 (emphasis added). By "conveying streams of information items" to a filter for the subsequent broadcasting of certain of that information, claim 1 itself captures the concept of a sending or "pushing" information out.

**C.   "as a function of objective or subjective criteria" (claims 1, 2, 11, and 18)**

The term is not indefinite. Defendant's primary complaint appears to be that the term is "so broad." Dkt. 35 at 6. Rather, the term is designed to capture *both* types of criteria—subjective and objective—and not to be limited to one or the other. For example, if a claim relates to using a wet

or dry towel to do something, the claim term is making clear that the wetness of the towel is not an issue but rather that a either condition of the towel infringes. Here, both types of criteria suffice for infringement.

The breadth of the claim term is fully supported by the specification. For "filtering," the specification describes both objective and subjective criteria:

- "Filtering is therefore effected on the basis of objective criteria such as geographical location, climate, language, etc." PX 770 at 2:21–22.

- "Filtering can be based on subjective criteria such as professional situation, leisure activities, user's interests, etc." *Id*. at 2:23–24.

Defendant contorts the term subjective to narrowly define it as "opinion." Dkt. 35 at 6 ("How can a claim limitation take into account whether something is fact (objective) or subjective (opinion)? Indeed, different people will have different interpretations of both objective criteria and subjective criteria.") The subjective criteria described in the specification is not an "opinion" or open to "different interpretations." Rather, the subjective criteria are instead things like "civil and family status, profession, leisure activities, interests." PX 770 at 4:20-23. These traits are neither "opinions" nor are they open to "different interpretations." Dkt. 35 at 6. Defendant's argument fails.

### D.     "filter mechanism" (claims 1, 7, 11, 13, and 16)

The term "filter mechanism" is not subject to means-plus-function treatment. "[T]he failure to use the word 'means' ... creates a rebuttable presumption ... that § 112, para. 6 does not apply." *Williamson v. Citrix Online LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015) (citations and internal quotation marks omitted). "When a claim term lacks the word 'means,' the presumption can be overcome and § 112, para. 6 will apply if the challenger demonstrates that the claim term

4

fails to recited sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Id.* at 1349 (citations and internal quotation marks omitted).

The term "filter mechanism" not a nonce word. Defendant has inappropriately fractured the term to isolate the term "mechanism" and create a means plus function argument. While the term "mechanism" as a stand-alone does not provide any indication of structure, the term "filter" most certainly does. The term is simply describing a device: *a filter*. The Federal Circuit has found that defining a particular claim term by its function is not improper and "is not sufficient to convert a claim element containing that term into a 'means for performing a specified function' within the meaning of [35 U.S.C. § 112(6)]." *See Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1374–75 (Fed. Cir. 2014) (*citing Greenberg v. Ethicon Endo–Surgery, Inc.,* 91 F.3d 1580, 1583 (Fed.Cir.1996)). In fact, the Federal Circuit has specifically called out "filter" as an example of a device that takes its name from a function it performs:

> Many devices take their names from the functions they perform. The examples are innumerable, such as 'filter,' 'brake,' 'clamp,' 'screwdriver,' or 'lock.'" There is nothing improper about defining "datalink" as a link that conveys data. If one of skill in the art at the relevant time would understand that datalinks can be both wired and wireless, then the patentee is entitled to the full range of that claim term.

*Id*. at 1375. Here, the filter is a device that takes its name from the function it performs. Moreover, this Court has found similar terms—e.g., "integral filter"—are not subject to § 112, ¶ 6. PX A, *Parkervision, Inc. v. Intel Corp*., Case 6:20-cv-00562-ADA, Dkt. 61 at 3 (July 22, 2021) (Finding that an "integral filter/frequency translator to filter and downconvert an input signal" is not subject to § 112, ¶ 6.) Similarly, the term "filter mechanism" is not subject to means-plus-function treatment. Defendant's argument fails—§ 112, ¶ 6 does not apply.

5

To the extent the Court believes means-plus-function treatment is appropriate, the specification describes sufficient structure: a filter.



PX 770 at Fig. 1. The specification also provides an accompanying algorithm: "The filter mechanism 6 therefore receives as input the criteria of the profile from the node profile management circuit 8 and the information associated with a given information item enabling it to be characterized." *Id.* at 4:44-48.

### E.    "retransmission mechanism" (claims 3, 7, and 15–16)

The term "retransmission mechanism" is not subject to means-plus-function treatment. The term "retransmission mechanism" is not a nonce word. A POSITA knows that a retransmission mechanism is a transmitter. Here again, the claims recite a definite structure: a transmitter. The claims do not simply recite a "mechanism," but rather a specific type of mechanism—a "retransmission mechanism." The Federal Circuit has found that defining a particular claim term by its function is not improper and "is not sufficient to convert a claim element containing that term into a 'means for performing a specified function' within the meaning of [35 U.S.C. §

112(6)]." *See Hill-Rom Servs,* 755 F.3d at 1374–75 (Fed. Cir. 2014). The term "retransmission mechanism" falls squarely within that category. *Id.* at 1375 ("There is nothing improper about defining 'datalink' as a link that conveys data."). In *Panoptis Pat. Mgmt., LLC v. Blackberry Ltd.*, the court rejected the Defendants' argument that the term "transmission unit" is a means-plus-function term governed by 35 U.S.C. § 112, ¶ 6. 2017 WL 497571, at *8 (E.D. Tex. Feb. 7, 2017) (Finding that "the claimed 'transmission unit' connotes structure to one of skill in the art by reciting details of how the unit functions as part of the claim."). PX A, *Parkervision, Inc. v. Intel Corp.*, Case 6:20-cv-00562-ADA, Dkt. 61 at 3 (July 22, 2021) (Finding that "a down-convert and delay module…" is not subject to § 112, ¶ 6.)

### F.   "synthesizing mechanism" (claims 2, 7, 10, and 18)

The term "synthesizing mechanism" is not subject to means-plus-function treatment for the same reasons as "filtering mechanism" and "retransmission mechanism." A POSITA knows that a synthesisizing mechanism is a synthesizer, as confirmed by the '770 Patent. *See* PX 770 at 3:33-35 ("It is nevertheless an option not to activate and not to install the synthesizer mechanism 10 in the node 1."); *id.* at 4:6-8 (The characterization of the profile of the node can therefore be updated in real time by the downstream node synthesizer device 10.). The claim does not recite a "mechanism" as a stand-alone, but rather a particular type of mechanism—a synthesizing mechanism. *See* PX A, *Parkervision, Inc. v. Intel Corp.*, Case 6:20-cv-00562-ADA, Dkt. 61 at 3 (July 22, 2021). Accordingly, the claimed "synthesizing mechanism" connotes structure to a POSITA. The term "synthesizing mechanism" is not subject to means-plus-function treatment.

## II.   U.S. PATENT NO. 8,774,790 (CASE NO. 6:20-CV-01020) CLAIM TERM

### A.   Overview and Person of Ordinary Skill in the Art

7

The '790 patent is entitled "Method and Apparatus for Improving Wireless Network Reliability." *See* PX 790 ('790 Patent).

For the '790 Patent, a POSITA would understand wireless networking devices (including base stations, and wireless terminals), networks, configurations, and communications between and among wireless devices and networks, and reconfiguring a base station based upon system dynamics.

1.   "said reconfiguration solution adapted to reconfigure the base station element to serve a portion of the plurality of wireless terminals, wherein the reconfiguration solution depends on a type of the failure condition" (claims 1, 14, 19, and 20)

When describing microprocessor-implemented functions, the specification must "disclose an algorithm for performing the claimed function" on the microprocessor "in any understandable terms including as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure." *Intelligent Automation Design, LLC v. Zimmer Biomet CMF & Thoracic, LLC*, 799 F. App'x 847,  851–52 (Fed. Cir. 2020). "[A]lgorithm in computer systems has broad meaning, for it encompasses in essence a series of instructions for the computer to follow, whether in mathematical formula, or a word description of the procedure to be implemented by a suitably programmed computer." *Typhoon Touch Techs., Inc. v. Dell, Inc*., 659 F.3d 1376, 1384 (Fed. Cir. 2011). Listing specific algorithms known to one of skill in the art may provide sufficient structure even if the specification does not provide details on their operation. *See e.g., Intelligent Water Sols., LLC v. Kohler Co.*, No. 2:16-CV-689, 2017 WL 2444723, at *7 (E.D. Tex. June 5, 2017). There is an exception for certain basic functions that can be performed by any general purpose computer without special programming, such as processing and receiving data, such that "it [is] not necessary to disclose more structure than the general purpose processor that performs

8

those functions." *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1316 (Fed.

Cir. 2011).

Here, the '790 Patent specification contains an algorithm for the "reconfiguration solution."

Specifically, the algorithm is disclosed in Figure 8, and the accompanying explanation of Figure

8 from the specification. Figure 8 depicts the selection of the reconfiguration solution types (808),[1]

power increase (810) and monitoring (812 and 814):



---

[1] "At step 808, a determination is made as to the type of reconfiguration Solution to be applied in response to detection of a failure condition on a base station element. If the reconfiguration solution type is a power level increase solution (i.e., a solution in which a power level employed by a base station element, or multiple base station elements, adjacent to the base station element with the failure condition is increased for increasing the wireless service coverage area of the reconfigured base station element), method 800 proceeds to step 810. If the reconfiguration solution type is a monitoring solution (i.e., a solution in which a base station is reconfigured to monitor for wireless terminals previously served by the base station element with the failure condition), method 800 proceeds to step 812." Ex. 3 ('790 Patent) at 9:48-62.

PX 790 at Fig. 8. The reconfiguration solution algorithm is described as follows:

> At step 810, a power level increase is determined for each of the at least one base station element to be reconfigured. The method 800 then proceeds to step 814. At step 812, signaling is determined, where the signaling is required for instructing the at least one base station element to be reconfigured to monitor for each wireless terminal previously served by the base station element with the failure condition. The at least one reconfigured base station element monitors for each wireless terminal previously served by the base station element with the failure condition for determining whether to establish a connection with the wireless terminals. The method 800 then proceeds to step 814. At step 814, the reconfiguration solution is implemented. The method 800 then proceeds to step 816, where method 800 ends.

*Id*. at 10:13-26. *See also id*. at 10:27-11:8.

A POSITA would understand the structure is a memory and processor, programmed to carry out the following algorithm:

1. Determine the configuration solution type to be implemented: power increase or monitoring. PX 790 at 9:49-62; Fig. 8 at 808.

2. If power increase, then determine a power level increase associated with each of the at least one base station element to be reconfigured. *Id*. at 10:13-15; Fig. 8 at 810.

3. If monitoring, then

   a. monitor for each wireless terminal previously served by the base station element with the failure condition for determining whether to establish a connection with the wireless terminals; *Id*. at Fig. 8 at 812.

   b. determine a direction of travel associated with each wireless terminal previously served by the base station element with the failure condition. *Id*. at Fig. 8 at 814.

4. Then implement the reconfiguration solution. *Id*. at Fig. 8 at 816.

## III.   U.S. PATENT NO. 9,548,977 (CASE NO. 6:20-CV-01021) CLAIM TERMS

### A.   Overview and Person of Ordinary Skill in the Art

The '977 patent is entitled "System, Method, and Apparatus for Performing Reliable Network, Capability, and Service Discovery." PX 977 ('977 Patent).

10

For the '977 Patent, a POSITA would be familiar with networking systems, the Wi-Fi Alliance, its standard for vendor specific attributes (and using such vendor specific attributes to extend the functionality of IEEE 802.11x), and knowledge of the IEEE 802.11x standard attributes.

**B.    "a vendor specific attribute according to the standard of Wi-Fi Alliance" (claims 1, 5, 10, 11, 13, and 15)**

Defendant argues that "because there is no antecedent basis for 'the standard of Wi-Fi Alliance,' the claims are indefinite." Dkt. 35 at 23.

1.    The claim term "a vendor specific attribute …" does not lack antecedent basis

A POSITA would understand the phrase "a vendor specific attribute according to the standard of Wi-Fi Alliance" not to lack antecedent basis. The claim refers to a particular type of "a vendor specific attribute." The phrase "a vendor specific attribute according to the standard of the Wi-Fi Alliance" has antecedent basis insofar as it is modified by an "a" rather than "the." Defendant's lack of antecedent basis argument improperly splits the term to be construed by isolating "the standard," but the phrase to be construed is "a vendor specific attribute" with the phrase "according to the standard of the Wi-Fi Alliance simply narrowing the vendor specific attribute to that of a particular type (i.e., the standard of the Wi-Fi Alliance). The term "a vendor specific attribute…" does not lack antecedent basis.

2.    A POSITA would inherently understand "the standard of the Wi-Fi Alliance" and the term does not require an antecedent recitation

A POSITA would inherently understand "the standard" or "a vendor specific attribute according to the standard of the Wi-Fi Alliance" to mean a vendor specific attribute according to the standard of the Wi-Fi Alliance. "Inherent components of elements recited have antecedent basis in the recitation of the components themselves." MPEP § 2173.05(e). The MPEP provides

11

an analogous example: "the limitation 'the outer surface of said sphere' would not require an antecedent recitation that the sphere have an outer surface." *Bose Corp. v. JBL, Inc.*, 274 F.3d 1354, 61 U.S.P.Q.2d 1216, 1219 (Fed. Cir. 2001). An antecedent basis [for a claim term] can be present by implication. *Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 76 U.S.P. Q.2d 1662, 1682 (Fed. Cir. 2005). A POSITA would understand that the Wi-Fi Alliance *inherently* has standard attributes by which "various networking techniques" are promulgated or are performed in accordance with. *See* PX 977 at 6:56-62 ("The mobile terminal may be capable of transmitting and/or receiving data from electronic devices according to various wireless networking techniques, including […] Wi-Fi Alliance (WFA) techniques…"); *id*. at 15:14-19 ("[T]he identification circuitry 228 may be further configured to receive a request for signed identification, capability, and service information from a terminal apparatus 102. The request may be in the form of […] a vendor specific attribute according to WFA…"). There is only one Wi-Fi Alliance so it is not an issue that "the … Wi-Fi Alliance."

*A person of ordinary skill in the art*. A POSITA would be familiar with the Wi-Fi Alliance, its standard for vendor specific attributes, and knowledge of the IEEE standard attributes.

*The Wi-Fi Alliance.* The Wi-Fi Alliance certifies equipment that has passed testing to ensure interoperability, security and reliability. The Wi-Fi Alliance describes itself as follows:

> Wi-Fi Alliance is the worldwide network of companies that brings you Wi-Fi®, one of the world's most valued communications technologies. Our vision is to connect everyone and everything, everywhere. Wi-Fi Alliance drives global Wi-Fi adoption and evolution through thought leadership, spectrum advocacy, and industry-wide collaboration. Our work includes the development of innovative technologies, requirements, and test programs that help ensure Wi-Fi provides users the interoperability, security, and reliability they have come to expect.

https://www.wi-fi.org/who-we-are

***The standard of the Wi-Fi Alliance***. While IEEE 802.11x is a "standard" that has standard attributes, the standard of the Wi-Fi Alliance has attributes to extend the functionality of the IEEE 802.11x standard. A POSITA would understand the function of the Wi-Fi Alliance (e.g., certification of interoperability), and that the Wi-Fi Alliance publishes vendor-specific attributes that can be used to extend functionality of IEEE 802.11x standard, including the Wi-Fi Easy Connect Specification. *See, e.g.,* Ex. 5 (Wi-Fi Alliance, Wi-Fi Easy Connect Specification Version 2 (2020)). A POSITA would understand this to be the standard of the Wi-Fi Alliance

***"[A] vender specific attribute according to the standard of the Wi-Fi Alliance."*** Standard attributes are necessary to communicate with an external device. Vendor-specific attributes, on the other hand, extend functionality beyond that provided by the public standard attributes, enabling the implementation of useful features necessary for management and service. Thus, a POSITA would understand that "a vendor specific attribute according to the standard of the Wi-Fi Alliance" is a non-standard attribute that is permitted, but not defined by the standard, and are established by the Wi-Fi Alliance. It is an extension of the standard attributes. That is, the standard is open-ended such that it will allow the vendor-specific attribute to be used (as opposed to the public use) and defined by the vendor.

The Wi-Fi Alliance establishes a set of listed extensions (i.e., attributes, codes or identifications) that may be used as a vendor specific attribute in the request. The vendor specific extensions according to the standard of the Wi-Fi Alliance are not fixed and can change over time. The standard allows what is essentially an unreserved number, code or identity that still complies with and is within the capability of the standard. For example, in 2020, vendor specific attributes included those established in the Wi-Fi Easy Connect Specification Version 2.0.

13



PX B at p. 120.

***A POSITA would understand what "the standard of the Wi-Fi Alliance" refers to***. The '977 Patent's reference to "the standard of the Wi-Fi Alliance" alone is sufficient to indicate to a POSITA that it is revering to the vendor specific attributes established by the Wi-Fi Alliance. *See Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1382 (Fed. Cir. 1999). In *Atmel*, the Federal Circuit addressed a similar issue:

> While we do agree with ISD that the district court properly held that the Dickson article may not take the place of structure that does not appear in the specification, the specification plainly states that "[k]nown Circuit techniques are used to implement high-voltage circuit 34. See On–Chip High Voltage Generation in NMOS Integrated Circuits Using an Improved Voltage Multiplier Technique, IEEE Journal of Solid State Circuits ...." '811 patent, col. 4, ll. 58–62. Atmel's expert, Callahan, testified that ***this title alone was sufficient to indicate to one skilled in the art the precise structure of the means recited in the specification***. The record indicates that that testimony was essentially unrebutted. That being the case, we conclude that summary judgment was improperly granted invalidating the '811 patent for indefiniteness under § 112, ¶ 2.

*Id.* (emphasis added). This is like saying "according to OGP of the Western District of Texas, Waco Division." Practitioners in this Court would know what is being referred to—the OGP means

14

the Order Governing Proceedings for Judge Albright's Court. Nothing more is necessary to identify the Order Governing Proceedings to an attorney with knowledge of the operations of the Court.

Moreover, the term "a vendor specific attribute according to the standard of the Wi-Fi Alliance" was clear and not indefinite to the Examiner. The Examiner expressly considered the addition of "the standard of the Wi-Fi Alliance" because the Applicant gained allowance of the claims upon the addition of this particular claim language. The claim language was added at the end of prosecution as an amendment to overcome a prior art rejection. Dkt. No. 35-3. Accordingly, the Examiner—a person of skill in art of this area—looked at this and understood what "the standard of the Wi-Fi Alliance" meant. Defendant provides no controverting testimony from an expert to overcome the Examiner's clear understanding of the term, as demonstrated by the prosecution history. Defendant cannot meet its burden of showing indefiniteness by clear and convincing evidence. *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017).

**C.** **"one processor; and at least one memory including computer program code, the at least one memory and the computer program code configured to, with the at least one processor, cause the apparatus to perform at least the following:" (claims 5, 11, and 13)**

Defendant argues the '977 patent does not disclose any structure or algorithm as required to perform the claimed three functions of "provid[ing] for transmission" and "receiv[ing] a response," and "verify[ing] … the signed access." Dkt. 35 at 27. Notably, this phrase is in the preamble. This phrase sets up the entirety of the objective environment of the claim but cannot be interpreted as means-plus-function.

Claims 5, 11 and 13 are *Beauregard* claims—named after *In re Beauregard*, 53 F.3d 1583 (Fed. Cir. 1995)—and are claims to a computer readable medium (e.g., a disk, hard drive, or other

15

data storage device) containing program instructions for a computer to perform a particular process." *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1373 (Fed. Cir. 2011).  The patentee specifically did not use the word "means" but rather intended for these claims to be interpreted as *Beauregard* claims. The Federal Circuit has instructed that *Beauregard* claims, such as claims 5, 11 and 13, are treated as method claims. *See Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1276 n.1 (Fed. Cir. 2012) (*Beauregard* claims "should be treated as method claims to avoid 'exalt[ing] form over substance'" (*quoting CyberSource*, 654 F.3d at 1374)). Because this term is in the preamble, and because claims 5, 11 and 13 are intended to be, and are in fact, *Beauregard* claims means-plus-function treatment is inappropriate. No structure is necessary.

> **D.**  **"A non-transitory computer-readable storage medium including computer-readable program code, which when executed by at least one processor provides operations comprising:" (claim 10)**

This phrase is located in the preamble and it is describing the objective environment of the claim but cannot be interpreted as means-plus-function. Rather, claim 10 is a *Beauregard* claim because it too is a claim to a computer readable medium (e.g., a disk, hard drive, or other data storage device) containing program instructions for a computer to perform a particular process." *CyberSource*, 654 F.3d at 1373. The patentee intended to invoke a *Beauregard* claim, but the patentee did not use "means" and did not intend to invoke means-plus function treatment. In fact, the Federal Circuit has instructed that *Beauregard* claims, such as claim 10, are treated as method claims. *See Digital-Vending Servs.*, 672 F.3d at 1276 n.1. Because this term is in the preamble, and because claim 10 is a *Beauregard* claim, means-plus-function treatment is inappropriate. No structure is necessary.

Dated: September 23, 2021

Respectfully submitted,

By:   */s/ Adam G. Price*

      Raymond W. Mort, III
      Texas State Bar No. 00791308
      The Mort Law Firm, PLLC
      100 Congress Avenue
      Suite 2000
      Austin, Texas 78701
      Tel/Fax: (512) 677-6825
      Email: raymort@austinlaw.com

      Adam G. Price
      Texas State Bar No. 24027750
      Christopher V. Goodpastor
      Texas State Bar No. 00791991
      Gregory S. Donahue
      Texas State Bar No. 24012539
      DiNovo Price LLP
      7000 N. MoPac Expressway
      Suite 350
      Austin, Texas 78731
      Telephone: (512) 539-2626
      Facsimile: (512) 539-2627
      Email: aprice@dinovoprice.com
      cgoodpastor@dinovoprice.com
      gdonahue@dinovoprice.com

      ATTORNEYS FOR PLAINTIFF WSOU
      INVESTMENTS, LLC D/B/A BRAZOS
      LICENSING AND DEVELOPMENT

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on September 23, 2021, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will send notification of such filing to all

counsel of record.

*/s/ Adam G. Price*
Adam G. Price